AO 91 (Rev. 02/09) Criminal Complaint

# United States District Court
### for the
### Western District of New York

United States of America

v.

**Kervin C. DRISCOLL** a/k/a "Mann"
**Terrance J. JACKSON** a/k/a "TJ" a/k/a "Teej"
**Rechelle R. BROOKS** and
**Jeffrey D. BROWNELL**

Case No. 23-MJ-619-MJP

*Defendants*

## CRIMINAL COMPLAINT

I, **CHRISTOPHER MAHAFFY**, the complainant in this case, state that the following is true to the best of my knowledge and belief.

Between in or about February 2023 and July 26, 2023, in the County of Monroe, in the Western District of New York, the defendants **Kervin C. DRISCOLL** a/k/a Mann, **Terrance J. JACKSON** a/k/a "TJ" a/k/a "Teej," **Rechelle R. BROOKS** and **Jeffrey D. BROWNELL** committed offenses described as follows:

did knowingly and unlawfully conspire to possess with intent to distribute and distribution of 500 grams or more of methamphetamine and 500 grams or more of cocaine, both Schedule II controlled substances, and a quantity of fentanyl and heroin, both Schedule I controlled substances, in violation of Title 21, United States Code, Section 846;

AND

defendants **Kervin C. DRISCOLL** a/k/a Mann, **Terrance J. JACKSON** a/k/a "TJ" a/k/a "Teej," and **Rechelle R. BROOKS**

committed an additional offense described as follows:

did knowingly and unlawfully possess a firearm in furtherance of a drug trafficking crime, in violation of Title 18, United States Code, Section 924(c)(1)(A).

SEE ATTACHED AFFIDAVIT OF SPECIAL AGENT CHRISTOPHER MAHAFFY.

This Criminal Complaint is based on these facts:

☒ Continued on the attached sheet.

_____
*Complainant's signature*

SA CHRISTOPHER MAHAFFY, DEA
*Printed name and title*

Affidavit and Criminal Complaint submitted electronically by email in .pdf format. Oath administered, and contents and signature, attested to me as true and accurate telephonically pursuant to Fed.R.Crim. P. 4.1 and 4(d) on:

Date: __August 29, 2023__

City and State:  __Rochester, New York__

_____
*Judge's signature*

HONORABLE MARK W. PEDERSEN
UNITED STATES MAGISTRATE JUDGE
*Printed name and title*

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

─────────────────────────────────────────

UNITED STATES OF AMERICA

     - v -                                       23-MJ-619-MJP

Kervin C. DRISCOLL a/k/a "Mann"
Terrance J. JACKSON a/k/a "TJ" a/k/a "Teej,"
Rechelle R. BROOKS, and
Jeffrey D. BROWNELL;

                              Defendants.

─────────────────────────────────────────

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT

I, **CHRISTOPHER MAHAFFY**, being duly sworn, depose and state:

1.    I am a Special Agent with the Drug Enforcement Administration (DEA), and as such I am an "investigative or law enforcement officer" of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 21, United States Code, Section 801, et seq. and Title 18, United States Code, Section 2516(1).

2.    I have been employed with the Drug Enforcement Administration since May 2014. I am currently assigned to the DEA Rochester Resident Office. Prior to becoming a DEA Special Agent, I received a Bachelor of Arts degree in Public Justice from the State University of New York at Oswego in May 2007. During my employment with the Drug Enforcement Administration, I completed 18

1

weeks of training at the DEA Office of Training, located in Quantico, Virginia, prior to being assigned to the Rochester Resident Office.  My training included classroom preparation in drug trafficking networks, drug identification, as well as practical application of surveillance, drug investigation, and arrest procedures.  During my tenure with the DEA, I have participated in numerous investigations relating to armed individuals that were involved in the distribution of controlled substances, including heroin, fentanyl, cocaine, cocaine base, methamphetamine, and other substances.  I have also participated in numerous interviews and debriefings of individuals involved in armed drug trafficking.  I am familiar with the habits, methods, routines, practices and procedures commonly employed by persons engaged in the armed trafficking of illegal drugs.  Additionally, I am familiar with the methods of use, effects, distribution, appearance, as well as the methods of manufacture of controlled substances.  I have been the affiant on multiple federal and state search warrants, arrest warrants and other applications.  During my time at the Rochester Resident Office, I have participated in multiple long-term narcotics investigations that utilized the court-authorized interception of wire communications that have resulted in the arrest of drug distributors, and the seizures of quantities of controlled substances and firearms.

3.     Based on my training my training and experience, I am aware that it is common practice for drug traffickers who desire to insulate themselves from detection by law enforcement to routinely utilize multiple telephones, counter surveillance, false or fictitious identities, and coded communications to communicate with their customers, suppliers, couriers, and other conspirators.  It is not unusual for

drug traffickers to initiate or subscribe such phone or phone device services under the names of other real or fictitious people.  Moreover, it is now a very common practice for drug traffickers to utilize all communication features of their telephones, most notably the voice call and text message features, nearly simultaneously to communicate with their conspirators.  I am aware that those who distribute controlled substances often use cryptic, coded or otherwise indirect language when telephonically discussing their illegal activities. I am aware also that those who distribute controlled substances will often add adulterants or additives to their controlled substances in order to increase the bulk of their distributable product, thereby increasing profit.  I am aware that drug traffickers often use firearms in order to defend themselves against and deter rival drug traffickers and/or potential robbers, enforce debt collections, and in other capacities to further their drug trafficking. Therefore, drug traffickers frequently are interested in obtaining firearms for these purposes.

4.     This affidavit is submitted in support of a Criminal Complaint charging **Kervin DRISCOLL, Terrance JACKSON, Rechelle BROOKS, and Jeffrey BROWNELL** with a violation of Title 21, United States Code, Sections 846 (conspiracy to possess with intent to distribute and distribution of 500 grams or more of methamphetamine and 500 grams or more of cocaine, both Schedule II controlled substances, and a quantity of fentanyl and heroin, both Schedule I controlled substances).  Additionally, the Criminal Complaint charges **DRISCOLL, JACKSON**, and **BROOKS** with a violation of Title 18, United States Code, Section 924(c)(1)(A) (possession of a firearm in furtherance of a drug trafficking crime).

3

5.     As more fully described below, the facts in this affidavit are based on a combination of my personal participation in this investigation, review of reports and documents completed by various police and other government agencies, and telecommunications providers, conversations with other law enforcement officers involved in this investigation and my review of conversations and text messages that have been intercepted pursuant court-authorized wiretaps.  The conclusions drawn in this affidavit are based on my training, experience as well as on the advice of other experienced federal, state and local narcotics investigators.  Since this affidavit is being submitted for a limited purpose, I have not included each and every fact that I know concerning this investigation.  Rather, I have set forth only those facts that relate to the issue of whether probable cause exists to believe that the above-named defendants committed the above-mentioned offenses.

## BACKGROUND OF INVESTIGATION

4.     Since February 2023, members of the New York State Police (NYSP), Elmira Police Department (EPD), Drug Enforcement Administration (DEA), and other law enforcement agencies have been investigating the Kervin DRISCOLL Drug Trafficking Organization (DRISCOLL DTO).  The investigation has utilized cooperating witness, confidential informants, audio-recorded controlled purchases of cocaine and methamphetamine, surveillance (live and by video camera), pen registers, traffic stops, and state eavesdropping warrants to monitor and record conversations of the members and associates of this DTO.

5.     The investigation has revealed that, since at least July 2021, the

DRISCOLL DTO has been distributing cocaine and methamphetamine throughout the City of Elmira, Chemung County, New York and the surrounding areas. The DRISCOLL DTO is led by Elmira, New York resident Kervin DRISCOLL a/k/a "Mann," who is responsible for organizing and overseeing the DTO's distribution of methamphetamine, cocaine and heroin/fentanyl throughout Elmira. The DRISCOLL DTO obtains its cocaine, methamphetamine, fentanyl, and heroin from an unidentified source and once the cocaine and methamphetamine are in Elmira, it is sold by distributors of the DRISCOLL DTO, including Terrance JACKSON. DRISCOLL (and on occasion JACKSON) utilize a black 2015 Acura TLX bearing New York license plate JDL-5335 to facilitate their drug transactions, including delivering drugs to lower-level distributors and customers in this vehicle. The DTO utilizes 1021 Oak Street to store narcotics and firearms, and to distribute narcotics directly to customers, and DRISCOLL utilizes JACKSON to conduct sales at 1021 Oak Street. DRISCOLL's wife and child reside at 320 Orchard Street in Elmira, New York. DRISCOLL's paramour, Rechelle BROOKS, utilizes her residence at 150 Harriet Street, Apartment 12B, Elmira, New York to store narcotics and firearms for the DRISCOLL DTO. DRISCOLL resides at both 320 Orchard Street and 150 Harriet Street, Apt 12B, regularly spending nights at either location.

6.      Between May 8, 2023 and July 26, 2023, the Honorable Ottavio Campanella, Chemung County Court Judge, issued orders authorizing the interception of wire communications and disclosure of GPS information over two cellular telephones primarily utilized by DRISCOLL:

- 607-481-4281 (hereafter **Target Telephone 1**), which is a Cellco Partnership LLP D/B/A Verizon Wireless Cellular Telephone and has no identified subscriber; and

- 607-793-0844 (hereafter **Target Telephone 2**) which is a Cellco Partnership LLP D/B/A Verizon Wireless Cellular Telephone which is subscribed to Kervin C. DRISCOLL, 320 Orchard Street, Elmira, New York.

7.       On February 8, 2023, the Honorable Peter Finnerty, Chemung County Court Judge, issued an order authorizing the installation of a Global Positioning System (GPS) mobile tracking device on a black 2015 Acura TLX bearing New York license plate JDL-5335 which is registered to Roni J. Case at 464 W. Gray Street, Elmira NY 14905.[1]  During the investigation, law enforcement has observed only DRISCOLL or JACKSON operate this vehicle. The monitoring of this tracking device continued through July 26, 2023.

8.       On July 18, Judge Campanella issued search warrants for multiple locations utilized by members of the DRISCOLL DTO, to include the drug house at 1021 Oak Street, DRISCOLL and his wife's residence at 320 Orchard Street, DRISCOLL/BROOKS' residence at 150 Harriet Street, Apartment 12B, as well as multiple vehicles, including DRISCOLL's black 2015 Acura bearing New York license plate JDL-5335. On July 26, 2023, the investigation culminated in the execution of these search warrants, resulting in the seizure of, among other things, approximately one kilogram of cocaine,[2] 170 grams of methamphetamine, two

---

[1] Roni Case is another paramour of DRISCOLL.

[2] The identification of the seized controlled substances described in this affidavit are based on positive results obtained from field-tests of the substances. The weights identified include the

loaded handguns, and drug distribution paraphernalia. See paragraphs 90-93, below. Some of the results of the investigation, including some of the intercepted conversations between DRISCOLL and members of the DTO, are described in more detail hereafter.[3]

## COOPERATING WITNESS INFORMATION

### Cooperating Witness #1 (CW1)

9.      On **July 22, 2023**, an individual who later became a cooperating witness (hereafter "CW1"), was arrested by NYSP Trooper Alex Krawczyk in possession of 5 grams of methamphetamine and approximately ½ gram of cocaine. CW1 was charged with a state felony drug offense and released.  While at SP Horseheads, CW1 requested to speak to investigators in exchange for receiving prosecutorial consideration.  During the interview, CW1 provided information to investigators regarding the methamphetamine and cocaine distribution activities of DRISCOLL and JACKSON.  CW1, an admitted methamphetamine and cocaine user, identified DRISCOLL and JACKSON as CW1's methamphetamine and cocaine supplier for approximately one to two months and has subsequently

---

packaging material and are based on weighing performed by law enforcement prior to submission to a forensic laboratory.

[3] The participants in the phone calls set forth in this affidavit have been identified by various means, including but not limited to personal knowledge and observations by officers on surveillance, information provided by reliable confidential sources, vehicle stops of targets, video footage from City of Elmira cameras at various locations, Department of Motor Vehicle driver's license and automobile registration records, and the names and nicknames used by interceptees to address such individuals during intercepted telephone conversations.

identified both DRISCOLL and JACKSON in photo arrays. CW1 told investigators that CW1 had purchased approximately 3.5 grams of cocaine and 3.5 grams of methamphetamine per week for the first month of the relationship and approximately 15 grams of methamphetamine per week for the second month of the relationship.  CW1 further stated that CW1 would purchase the narcotics at 1021 Oak Street from both JACKSON and DRISCOLL, and that on the day of his/her arrest, CW1 was supplied methamphetamine from JACKSON at this address.

## CONTROLLED PURCHASES OF COCAINE, METHAMPHETAMINE AND FENTANYL FROM THE DRISCOLL DTO

10.    Since February 2023, members of the investigative team have made a total of eight (8) controlled, audio-record controlled purchases of narcotics from DRISCOLL and JACKSON, purchasing a total of 224 grams of methamphetamine, 33 grams of cocaine, and six (6) grams of fentanyl. A summary chart of these controlled purchases from DRISCOLL and JACKSON is set forth below:

## CONTROLLED PURCHASES OF NARCOTICS FROM DRISCOLL AND JACKSON

## February 2023 – July 2023

| Buy | Seller | Drug | Quantity (grams) | Date |
|-----|--------|------|------------------|------|
| #1 | DRISCOLL | Cocaine | 14 | February 2 |
| #2 | DRISCOLL | Cocaine | 14 | February 16 |
| #3 | DRISCOLL | Methamphetamine | 56 | March 3 |

| #4 | DRISCOLL | Methamphetamine | 56 | March 24 |
| #5 | DRISCOLL | Methamphetamine | 56 | April 6 |
| #6 | DRISCOLL | Methamphetamine | 56 | April 14 |
| #7 | DRISCOLL | Fentanyl | 6 | May 1 |
| #8 | JACKSON | Cocaine | 5 | July 25 |

11.

12.     On February 2, 2023, members of the NYSP and EPD met with an individual who would subsequently be established as an Elmira Police Department confidential source (hereafter "CS1").[4]  During this initial debriefing, CS1 identified Kervin DRISCOLL as a member of a cocaine, heroin and methamphetamine distribution group operating throughout Elmira and the surrounding area.

13.     On February 2, 2023, CS1 made a controlled, audio-recorded purchase of approximately half an ounce (14 grams) of cocaine from Kervin DRISCOLL in exchange for $500 in U.S. Currency at a residence in the City of Elmira (hereinafter "Elmira Residence 1").[5]  To arrange the controlled purchase, CS1 contacted DRISCOLL by calling **Target Telephone 1** in the presence of law enforcement officers.

14.     On February 16, 2023, CS1 made a controlled, audio-recorded

---

[4] CS1 has been a confidential informant for Elmira Police Department since approximately January 2023.  The information provided by CS1 has been independently corroborated by investigators though physical surveillance, records analysis, court-authorized wire and electronic interceptions and other investigative means.  Investigators have determined that the information provided by CS1 is credible.  CS1 has provided this information to investigators in exchange for a reduction in charges.

[5] The location of Elmira Residence 1 is known to law enforcement. However, the exact address is not disclosed in this affidavit to avoid disclosing the identity and jeopardizing the safety of CS1.

purchase of approximately half an ounce (14 grams) of cocaine from Kervin DRISCOLL in exchange for $500 in U.S. Currency at Elmira Residence 1.  To arrange the controlled purchase, CS1 contacted DRISCOLL by calling **Target Telephone 1** in the presence of law enforcement officers.

15.    On March 3, 2023, CS1 made a controlled, audio-recorded purchase of approximately two (2) ounces (56 grams) of methamphetamine from Kervin DRISCOLL in exchange for $400 in U.S. Currency at Elmira Residence 1. To arrange the controlled purchase, CS1 contacted DRISCOLL by texting **Target Telephone 1** in the presence of law enforcement officers.

16.    On March 24, 2023, CS1 made a controlled and audio-recorded purchase of approximately two (2) ounces (56 grams) of methamphetamine from Kervin DRISCOLL in exchange for $400 in U.S. Currency at Elmira Residence 1. To arrange the controlled purchase, CS1 contacted DRISCOLL by calling **Target Telephone 1** in the presence of law enforcement officers.

17.    On April 6, 2023, CS1 conducted a controlled and audio-recorded purchase of approximately two (2) ounces (56 grams) of methamphetamine from Kervin DRISCOLL in exchange for $400 in U.S. currency at Elmira Residence 1. To arrange the controlled purchase, CS1 contacted DRISCOLL by calling **Target Telephone 1** in the presence of law enforcement officers.  During the conversation, the following statements were made:

CS1: *What's up with the food?*

Kervin Driscoll (KD): *That's not my lane right now, but I'll see what I can do.*

18.     Based on my training, experience and knowledge of this investigation, "food" is a commonly used code for heroin.  Additionally, drug dealers and their customers will often use coded terms during conversation to evade law enforcement detection.

19.     On April 14, 2023, CS1 made a controlled and audio-recorded purchase of approximately two (2) ounces (56 grams) of methamphetamine from Kervin DRISCOLL in exchange for $400 in U.S. Currency at Elmira Residence 1. To arrange the controlled purchase, CS1 contacted DRISCOLL by texting **Target Telephone 1** in the presence of law enforcement officers. During the conversation, the following statements were made:

CS1: *What is up with the food?*
Kervin Driscoll (KD): *I have some raw and can do $80 a gram.*

20.     Based on my training, experience and knowledge of this investigation, when CS1 inquires about the food, CS1 is asking DRISCOLL about the availability of heroin for sale.  When DRISCOLL responds that he has some "raw" and that he can do $80 a gram, DRISCOLL is informing CS1 that he has undiluted heroin available for $80 a gram.

21.     On May 1, 2023, CS1 made a controlled and audio-recorded call to Kervin DRISCOLL to ask if he could meet up.  CS1 contacted DRISCOLL by

calling **Target Telephone 1** to arrange a purchase of heroin.  DRISCOLL arrived at the designated location and the following conversation occurred:

> Kervin Driscoll (KD): *Why aren't you buying coke or glasses?*
> CS1: *I don't need that but I want food.*
> KD: *I have to go get it.*

22.    After asking CS1 why he/she was not purchasing cocaine or methamphetamine ("*Why aren't you buying coke or glasses?*"), DRISCOLL departed and returned a short time later and provided CS1 with six (6) grams of fentanyl ("*food*") in exchange for $500 in U.S. currency at Elmira Residence 1.

23.    On July 2, 2023, members of the NYSP and EPD, met with an individual who would subsequently be established as an Elmira Police Department confidential source (hereafter CS2).[6]  During this initial debriefing, CS2 identified 1021 Oak Street as the location he/she goes to for the purchase of cocaine.   CS2 later identified Terrance JACKSON as a member of a cocaine distribution group operating throughout Elmira and the surrounding area who had sold CS2 approximately 3.5 to 7 grams of cocaine per month for approximately 3 years.  Since approximately May 2023, CS2 has gone to 1021 Oak Street to meet JACKSON.

24.    On July 25, 2023 CS2 made a controlled and audio-recorded call to

---

[6] CS2 has been a confidential informant for Elmira Police Department since approximately July 2023.  The information provided by CS2 has been independently corroborated by investigators though physical surveillance, records analysis, court-authorized wire and electronic interceptions and other investigative means.  Investigators have determined that the information provided by CS2 is credible.  CS2 has provided this information to investigators in exchange for a reduction in charges.

Terrance JACKSON to meet up.  CS2 contacted JACKSON by calling 607-259-7223

to arrange the purchase of cocaine.  In sum and substance, CS2 told JACKSON that

he/she wanted to come see him at 1021 Oak Street and purchase the usual amount

of cocaine CS2 purchases.  JACKSON told CS2 to come see him. JACKSON and

CS2 met at 1021 Oak Street and entered the location, where JACKSON sold CS2

approximately five (5) grams of cocaine.

### Kervin DRISCOLL a/k/a Mann

25.     Kervin DRISCOLL is a 39 year-old African American male who has

one felony drug conviction and one violent felony conviction.  On March 23, 2007,

DRISCOLL was convicted in County Court, Chemung County, of the following two

felonies, which stemmed from different arrests/incidents:

- Criminal Possession of a Controlled Substance in the Third Degree, a class B felony, for which he was sentenced to 2 years imprisonment and 1 year post-release supervision.
- Attempted Assault in the First Degree, a class C violent felony, for which he was sentenced to 3 ½ years imprisonment and 2 ½ years post-release supervision to run concurrently.

Intercepted Calls Involving DRISCOLL

26.     On **May 28, 2023**, at approximately **2:00 PM** (Ref# 676), **Target**

**Telephone 1**, used by DRISCOLL made the following outgoing call to 312-599-

7193, utilized by unknown female co-conspirator a/k/a/ "Cat":

U/F "Cat": *Hello?*

Kervin Driscoll (KD): *Yo, Cat, what up man? Why you didn't let me know how*

13

*that was?*

Cat: *Because I threw it in the toilet.*

KD: *Stop frontin.*

Cat: *I swear to God.  Hold on I am around kids.  Let me go in the other room.*

KD: *Why did you throw it in the toilet?*

Cat: *I'm a tell you why...Cause I dumped it in a spoon because it was all powder to bring it back with water and it turned purple so I was scared that it was fentanyl.  I threw that shit in the toilet.*

KD: *Nah man. Man, what's wrong with you?*

Cat: *Then why did it turn purple?*

KD: *Which one?  What one are you talkin...the bater I gave you?*

Cat: *No no… that was fine.  The little one that you told me to try.  It was all powder so I put it in a spoon and cooked it back so it would be rock and it turned pinkish purple and that's the color of heroin so I was scared.  I put that shit in the toilet.*

KD: *Nah I don't know Cat.  The other shit I gave you was good, right?*

Cat: *The bater?*

KD: *Yeah.*

Cat: *Yeah, it just has a little too much bake but when I cooked it back it was alright.*

KD: *There's no baking soda.  I don't cook my shit with baking soda.*

Cat: *Well, whatever it was. Yeah, I'll come back to you, definitely.*

KD: *I want you to try these dimes, though.  Next time you come.*

Cat: *Not that what you gave me last night.  I'm scared of that.*

KD: *I don't, I don't know what that was.  I got something for you.*

Cat: *Well, I am headed up to the hotel room now to get out clothes because I am about to take the kids to Mt. Piska.  I'll stop by on my way.  I'll be there in five minutes.*

KD: *Aite.*

Cat: [background: *Quincy, You got your socks and shoes on?  Alright. Come on.*]

[End of Call]

14

27.     Based on my training, experience and knowledge of this investigation, in this phone call, DRISCOLL called an unknown female (U/F) "Cat" asking her why she didn't tell him her view of the quality of the cocaine she had previously purchased from DRISCOLL. "Cat" tells DRISCOLL she feared it was fentanyl so she threw the product in the toilet. "Cat" stated she dumped it in a spoon to bring it "back" from powder cocaine by cooking it into the hardened, rock form of crack cocaine. "Cat" indicated she started to cook the powder and it turned purple so she believed that the powder DRISCOLL provided her was not cocaine but was actually fentanyl.  DRISCOLL then asks "Cat" which one she was talking about and referred to it as the "bater" he gave her. In my training and experience, "bater" is a common reference to powder cocaine and is referred to this way because it is the batter or ingredient used to make crack cocaine, which is often made by cooking powder cocaine with baking soda. "Cat" says it had a little too much "bake" (baking soda) and DRISCOLL responded saying that he doesn't put baking soda in his cocaine. DRISCOLL then explains he has a new variation of narcotic for her to try ("*I want you to try these dimes, though.  Next time you come.*").   "Cat" says she will be there in five minutes.

28.     On **June 1, 2023**, at approximately **11:00 AM** (Ref# 934), **Target Telephone** 1, used by DRISCOLL received the following incoming call from 607-438-6523, utilized by unknown male a/k/a Will:

Kervin Driscoll (KD): *What's good OG?*
Unknown Male (UM): *You in the area?*

15

KD: *Who dis? Will?*

UM: *Yeah.*

KD: *I'm about to be. What's up?*

UM: *I need something man. You got a 50 on you?*

KD: *A what?*

UM: *How long will it take? And listen, I want to know for long? How long you gonna be? It's 11:00 now.*

KD: *Like 20 minutes man. What you wanted?*

UM: *Ahh a [unintelligble].*

KD: *Huh?*

UM: *A [unintelligible]. No powder. All rocks. No shake.*

KD: *What do you got?*

UM: *A hundred.*

KD: *Alright.*

UM: *Twenty minutes?*

KD: *Huh?*

UM: *You said 20 minutes?*

KD: *Yeah.*

UM: *You will be here by 11:30 then?*

KD: *Yup.*

UM: *Alright, no powder. I want all….[Driscoll hangs up]*

[End of Call]


29.     Based on my training, experience and knowledge of this investigation, in this phone call, DRISCOLL received a call from an unknown male asking for two (2) grams of crack cocaine for $100 ("hundred"). In my training and experience, it is common for drug dealers or drug consumers to refer to cocaine as "powder" and

16

crack cocaine as "rocks" due to the cocaine hardening up once it is cooked into crack cocaine.  The unknown male makes it clear that he doesn't want the powder cocaine ("*no powder*").

30.    On **June 2, 2023,** at approximately **1:06 PM** (Ref# 1011), **Target Telephone 1**, utilized by DRISCOLL, received the following incoming text from 607-684-1780, utilized by Michael Krisher, "Hey brother I have 2,000 can you accommodate me ."

31.    At approximately **1:19 PM** (Ref# 1019), **Target Telephone 1**, used by DRISCOLL, received the following incoming call from 607-684-1780, utilized by Michael Krisher:

> Michael Krisher (MK): *Hey bro! I'm sorry to call you…*
>
> Kervin Driscoll (KD): *Yo, please don't text me…text me no shit like that no more please.*
>
> MK: *Bro I'm sorry I ..I got people from out of state and they're leaving and I've been sick and I fell asleep….and…I'm trying to accommodate them and I needed to…needed to know before I came.*
>
> KD: *Alright.  What you trying to do?*
>
> MK: *A..a…a…a...pound.*
>
> KD: *I can't do it for that.  What you said.*
>
> MK: *No.  26?*
>
> KD: *Nah.*
>
> MK: *Alright.*
>
> KD: *I can't do it for that.*
>
> MK: *Um…can you accommodate with whatever we…*

KD: *You got the whole.*

MK: *What I got?*

KD: *Huh?*

MK: *(Unintelligible)...You can accommodate for...that*

KD: *You ain't got the whole 26 right now?*

MK: *Ok.  Alright.  I'll let you...I'll let you know as soon as I get there brother.
Ok?*

KD: *Do you...do you got the whole 26 or no?*

MK: *Yes. Yes.*

KD: *(Coughing)*

MK: *Alright.  Alright brother.  I'll be on the way.*

KD: *(Coughing)...Come over.*

[End of Call]

30.     Based on my training, experience, and knowledge of this investigation,
drug dealers prefer to use coded language in calls and text message communication
to avoid law enforcement detention. In this phone call, following Krisher's text
message *("Hey brother I have 2,000 can you accommodate me .")*, DRISCOLL
immediately warned Krisher to be more careful texting uncoded or explicit
references to drug-related transactions to DRISCOLL ("*Yo, please don't text me…text
me no shit like that no more please.*").  I believe that Krisher's use of the term "I have
2,000" was too direct of a message for DRISCOLL, who was very careful to speak in
code on the phone. After DRISCOLL inquired how much methamphetamine
Krisher wanted to purchase from DRISCOLL, KRISHER indicated one pound of

methamphetamine (*"What you trying to do?" … "a…pound"*). Later in the call, after there appeared to between some confusion between the two parties, DRISCOLL obtained confirmation from Krisher that he had all of the money on hand to purchase the pound of methamphetamine (DRISCOLL: *"Do you…do you got the whole 26 or no?"* followed by Krisher*: "Yes. Yes."*), and directed Krisher to meet him at to purchase the requested pound of methamphetamine for $2,600 (*"Come over."*).

31.    On **June 8, 2023**, at approximately **5:04 PM** (Ref# 1314), **Target Telephone** 1, used by DRISCOLL, placed the following outgoing call to 607-259-4876, utilized by Michael Deragon:

Michael Deragon (MD): *Yeah?*

Kervin Driscoll (KD): *What's up buddy?*

MD: *Hey what up?*

KD: *How ya doing man? What's going on?*

MD: *Oh not a lot man. What you up to?*

KD: *Ain't shit man just checking in with you.*

MD: *Huh?*

KD: *Ain't much just checking in with you.*

MD: *Yeah, I could use.*

KD: *You ready?*

MD: *Yeah.*

KD: *Alright I'm gonna pull up on you.*

MD: *Alright, bout bout, what's your ETA?*

19

KD: *Give me…*

MD: *Hour or so?*

KD: *Yeah, 'bout an hour or 45 min.*

MD: *Alright man.*

KD: *Alright.*

[End of Call]

32.     GPS data from DRISCOLL's black Acura showed that at approximately **5:54 PM**, the vehicle departed the vicinity of 150 Harriett Street, Apartment 12B and traveled directly to Borden Hill Road in the Town of Breesport, arriving at approximately **6:10 PM** and departing shortly afterwards.[7]    At approximately **6:13 PM**, law enforcement on physical surveillance observed DRISCOLL's black Acura turn off Borden Hill Road and travel to a Dollar General in the Town of Breesport, at which time law enforcement observed both DRISCOLL and Terrance JACKSON exit the vehicle.

33.     Based on my training, experience and knowledge of this investigation, in this phone call, DRISCOLL placed an outgoing call to Michael Deragon with the purpose of seeing if Deragon needed to be resupplied with a quantity of narcotics ("*Ain't much just checking in with you.*").  Deragon then informed DRISCOLL that he was ready to be resupplied with a quantity of narcotics ("*Yeah, I could use.*"). DRISCOLL and Deragon then set up an estimated time to conduct the narcotics transaction. Thereafter, DRISCOLL and JACKSON traveled to Deragon's residence

---

[7] Law enforcement is aware that Deragon's residence is on Borden Hill Road.

in Breesport and supplied Deragon with a quantity of narcotics.

### Terrance JACKSON a/k/a/ TJ a/k/a Teej a/k/a Joey

34.     Terrance JACKSON is a 35 year-old African American male who has three felony convictions from County Court, Chemung County, on August 11, 2008 stemming from separate arrests/incidents:

- JACKSON was convicted by guilty plea of Criminal Sale of a Controlled Substance in the Third Degree, a class B felony, for which he was sentenced to 3 years imprisonment and 2 years post-release supervision.

- JACKSON was convicted by verdict after trial of Attempted Assault in the Second Degree, a class E violent felony, for which he was sentenced to 16 months imprisonment.

- JACKSON was convicted by guilty plea of Criminal Possession of a Weapon in the Second Degree, a class C violent felony, for which he was sentenced to 10 years imprisonment and 5 years post-release supervision.

35.     On **June 7, 2023**, at approximately **6:22 PM** (Ref# 93), **Target Telephone 2**, used by DRISCOLL made the following outgoing call to 607-742-6507, utilized by Terrance JACKSON.  At approximately **6:23 PM** (Ref# 1282), **Target Telephone 1**, used by DRISCOLL, received an incoming from 312-599-7191, known to be utilized by the Unknown Female a/k/a "Cat."  This call (Ref# 1282) was not monitored due to the ongoing monitoring of **Target Telephone 2** (Ref# 93).

Kervin Driscoll (KD): *Yo, you over there bro or no?*

Terrance Jackson (TJ): *Yeah I'm over there. I'm about to leave right now. I'm*

*leavin' right right now.*

KD: *Oh you leavin'? Alright, this bitch "Cat" keeps calling me.*

KD: [background: *Hello? No, I ain't there. I think bro there, but he said he's about to leave.*]

TJ: *Where's she at? Where's she at man? Yo, bro?*

KD: *Yo, she said she's coming in five, um, ten minutes.*

TJ: *Ten minutes.*

KD: *Yeah.*

TJ: *Alright.*

[End of Call]

36.     At approximately **6:39 PM**, through a combination of physical surveillance and a covert camera positioned in the vicinity of 1021 Oak Street, law enforcement observed a brown 2017 Kia sedan, known to be operated by "Cat," pull in the driveway of 1021 Oak Street, at which time "Cat" exited the vehicle and walked toward the front of 1021 Oak Street. At approximately **6:50 PM**, footage from the covert camera showed "Cat" walking from the residence, and returning to her vehicle, before departing at approximately **6:52 PM**.

37.     Based on my training, experience and knowledge of this investigation, in this phone call, DRISCOLL is utilizing **Target Telephones 1 and 2** at the same time, calling JACKSON to meet "Cat" at 1021 Oak Street to supply her with narcotics, while then also receiving a call from "Cat" during which DRISCOLL states that JACKSON is going to be leaving to meet her at 1021 Oak Street in a few minutes ("*I think bro there, but he said he's about to leave*"). DRISCOLL tells JACKSON that "Cat" will be at 1021 Oak Street to obtain the narcotics in 5-10 minutes ("*she*

*said she's coming in five, um, ten minutes*").  Further, I believe that when "Cat" briefly entered 1021 Oak Street, JACKSON sold her the quantity of narcotics inside 1021 Oak Street.

### Rechelle BROOKS

38.    Rechelle BROOKS is a 34 year-old African American female with no felony convictions.  BROOKS lives at 150 Harriet Street, Apartment 12B in Elmira, where DRISCOLL spends most nights.

<u>Intercepted Calls Involving Rechelle BROOKS</u>

### BROOKS TRANSPORTS DRISCOLL TO CONDUCT A NARCOTICS TRANSACTION WITH BROWNELL

39.    On **June 7, 2023**, at approximately **5:10 PM** (Ref# 1280), **Target Telephone 1**, utilized by DRISCOLL, received the following incoming call from 607-664-6821, utilized by Jeffrey BROWNELL:

> Jeffrey Brownell (JB): *He got 8.*
>
> Kervin Driscoll (KD): *Alright. I ain't gonna be back til like 7:30 man. Can you wait?*
>
> JB: *I guess I have to.*
>
> KD: *I got you. Alright.*
>
> JB: *Alright, um, ca…call me.*
>
> KD: *Alright.*
>
> JB: *Alright.*
>
> [End of call]

40.     Based on my training, experience, and knowledge of this investigation, I believe BROWNELL called DRISCOLL to tell him that BROWNELL wanted to purchase $800 worth of cocaine for a customer of BROWNELL's ("*He got 8.*"). DRISCOLL agreed to supply the cocaine but indicated it would be later. ("*Alright. I aint't gonna be back til like 7:30 man. Can you wait? …I got you. Alright.*").

41.     At approximately **7:15 PM** (Ref# 1287), **Target Telephone 1**, utilized by DRISCOLL, received the following incoming call from 607-664-6821, utilized by Jeffrey BROWNELL:

> Kervin Driscoll (KD): *I'll be back in like 20…15 more minutes. Where you gonna be at?*
>
> Jeffrey Brownell (JB): *I'm in Bath right now, but…*
>
> KD: *You wanna meet me over there, where I see you on Fenderson?*
>
> JB: *What's that, Fenderson?*
>
> KD: *Wanna go to, you wanna go over there on Fenderson?*
>
> JB: *I guess.*
>
> KD: *Alright. I'll call you when I'm leavin', so we can get there the same time.*
>
> JB: *Alright.*
>
> [End of call]

42.     Based on my training, experience, and knowledge of this investigation, DRISCOLL called BROWNELL to update his arrival time ("*I'll be back in like 20…15 more minutes. Where you gonna be at?*") and the location of Fenderson Street Extension in Elmira ("*You wanna meet me over there, where I see you on Fenderson?...*

24

*Wanna go to, you wanna go over there on Fenderson?*").

43. At approximately **8:10 PM**, physical surveillance observed DRISCOLL parked in the black Acura in the road near 150 Harriet Street.

44. At approximately **8:12 PM**, (Ref# 101), after several attempts between **7:57 PM** and **8:12 PM** to contact 607-731-0324, utilized by Rechelle BROOKS, **Target Telephone 2**, utilized by DRISCOLL, made the following outgoing call to BROOKS at 607-731-0324:

> Rechelle Brooks (RB): *I told you I was coming*!
>
> Kervin Driscoll (KD): *Yeah, I know! It don't take that long to get from Elmira College.*
>
> RB: *I...There was, there was [Unintelligible] all the people were there!*
>
> KD: *[Overlapping] It take you fifteen!*
>
> KD: *You were in the car when I spoke to you.*
>
> RB: *[Unintelligible with KD and RB talking over each other] to get out of...!*
>
> KD: *You were in the car when I spoke to you.*
>
> RB: *[overlapping with KD] I had to wait to three minutes to get out of the parking lot*!
>
> KD: *Alright yo*.
>
> [End of Call]

45. Based on my training, experience, and knowledge of this investigation, I believe that DRISCOLL was waiting impatiently at BROOKS' residence at 150 Harriet Street for her to arrive and transport him to supply BROWNELL with the

cocaine BROWNELL and DRISCOLL had discussed earlier.

46.     Shortly after the call at **8:12 PM**, physical surveillance observed BROOKS arrive at the residence driving the white Lexus SUV. DRISCOLL then repositioned the black Acura to the rear parking area of the residence, enter the passenger side of BROOKS' Lexus, which then departed in the direction of Corning, New York.

47.     At approximately **8:21 PM** (Ref# 1293), **Target Telephone 1**, utilized by DRISCOLL, made the following outgoing call to 607-664-6821, utilized by Jeffrey BROWNELL:

> Kervin Driscoll (KD): *Yo, where you at man?*
>
> Jeffrey Brownell (JB): *Bath.*
>
> KD: *I'm on my way.*
>
> JB: *Alright, I'll be there.*
> [End of call]

48.     At approximately **8:58 PM** (Ref# 1297), **Target Telephone 1**, utilized by DRISCOLL, received the following incoming call from 607-664-6821, utilized by Jeffrey BROWNELL:

> Jeffrey Brownell (JB): *Hello.*
>
> Kervin Driscoll (KD): *What's up?*
>
> JB: *I'll be there in two minutes.*
>
> KD: *Alright.*

JB: *Alright.*

[End of call]

49.     At approximately **9:02 PM,** physical surveillance observed BROOKS' white Lexus and a red Chevy pick-up with New York license plate JBB-8854, previously known to law enforcement as a vehicle BROWNELL operated, parked adjacent to each other in the driveway of 3421 Fenderson Street Extension.  Shortly afterwards, BROOKS' Lexus departed the meet location.   At approximately **9:26 PM,** physical surveillance observed BROOKS' Lexus return to 150 Harriet Street.

50.     Based on my training, experience, and knowledge of this investigation, I believe that BROOKS utilized her white Lexus to transport DRISCOLL with $800 worth of cocaine from 150 Harriet Street for the purpose of supplying BROWNELL with cocaine. BROOKS utilized her white Lexus to transport DRISCOLL to meet BROWNELL, was present during the transaction between BROWNELL and DRISCOLL, and drove DRISCOLL directly back to her residence at 150 Harriet Street, Apartment 12B afterward.

51.     On **June 21, 2023**, at approximately **6:17 PM**, GPS data reflected that **Target Telephone 2**, utilized by DRISCOLL, was located in the area of Broadway and West 149th Street in New York City.  At approximately **6:24 PM** (Ref# 1329), **Target Telephone 2** made the following outgoing call to 607-731-0324, utilized by Rechelle BROOKS:

Kervin Driscoll (KD): *What you doing? You home?*

Rechelle Brooks (RB): *Yeah, but I'm in class.*

KD: *Huh?*

RB: *I'm in class. What..?*

KD: *Alright. I'm gonna send Bro by there.*

RB: *Huh? For what?*

KD: *I'm gonna have Bro come over there.*

RB: *I'm on my class.*

KD: *Huh?*

RB: *I'm at, I'm on class.*

KD: *Alright. What does that mean?*

RB: *Is he getting something? Like, I'm in class.*

KD: *Obviously! Why else would I send him over there? What you talking about?*

RB: *'Cause I'm just saying, I'm on zoom. I'm in class.*

KD: *Alright, just give him…I'm gonna FaceTime you.*

[End of Call]

52.     At approximately **6:42 PM**, investigative team members on surveillance observed Terrance JACKSON arrive at BROOKS' apartment at 150 Harriett Street, Apartment 12B in a white 2021 Honda bearing New York license plate JML-3826 and enter the location. At approximately **6:44 PM**, JACKSON exited 150 Harriet Street, Apartment 12B carrying a black and white plastic bag in his hand and entered the vehicle.  JACKSON was then surveilled as he traveled from Harriet Street to 420 Linden Place, where he arrived at **6:50 PM**.  JACKSON then departed 420 Linden Place and drove to 1021 Oak Street, arriving at **6:55 PM**. JACKSON exited his vehicle and entered 1021 Oak Street carrying the black and white plastic bag he carried from 150 Harriet Street, Apartment 12B.  While JACKSON was at 1021 Oak Street, multiple people were observed going to 1021

Oak Street for short durations.

53.     Based on my training, experience, and knowledge of this investigation, DRISCOLL contacted BROOKS while he was in New York City, and told her that JACKSON was coming to her residence at 150 Harriet Street, Apartment 12B ("*I'm gonna send Bro by there… I'm gonna have Bro come over there.*").  BROOKS asks if it's to pick up a quantity of drugs ("*Is he getting something?*"), DRISCOLL confirms that is the reason ("*Obviously! Why else would I send him over there?*"). As DRISCOLL is about to tell BROOKS exactly what to give JACKSON when he gets there, he decides not to and tells her he will contact her over FaceTime ("*Alright, just give him…I'm gonna FaceTime you*").[8] JACKSON thereafter arrived at 150 Harriet Street, Apartment 12B, and carried a bag out of that location and later into 1021 Oak Street. Numerous people were then observed coming and going from that location while JACKSON was inside, which is consistent repeated sales of narcotics to customers. As such, I believe that JACKSON was selling narcotics to customers from inside 1021 Oak Street that he had obtained from BROOKS' residence at 150 Harriet Street, Apartment 12B. Furthermore, throughout this investigation, investigators have also witnessed DRISCOLL travel to 150 Harriett Street, Apartment 12B immediately before meeting with customers to perform illegal drug sales.

54.     On **July 1, 2023**, at approximately **11:55 AM** (Ref# 2370), **Target**

---

[8] Utilizing FaceTime instead of a telephonic call is a common way narcotics traffickers attempt to avoid the interception of drug-related conversations on wiretaps by law enforcement. During the course of the wiretap in this investigation, DRISCOLL frequently utilized FaceTime to talk more explicitly and attempt to avoid law enforcement interception of the communication, as I believe he did in this call.

**Telephone 2**, utilized by DRISCOLL, received the following incoming call from 607-731-0324, utilized by Rechelle BROOKS:

> Kervin Driscoll (KD): *Damn, I left my Tracfone.*
> Rechelle Brooks (RB): *Yeah.*
> KD: *Alright, I'm coming right back.*
> [End of Call]

55.     Based on my training, experience and knowledge of this investigation, in this phone call, I believe BROOKS called DRISCOLL to tell him that he left a phone that he utilizes to conduct drug deals on at her apartment and he realized he had left it there at about the time she called, as reflected by his statement when he first answered the call, "*Damn I left my Tracfone.*" Additionally, drug dealers often utilize multiple phones, to include cheaper, "low tech" phones such as Tracfones, in order to evade law enforcement detection by compartmentalizing phones. Another benefit to cheaper, "low tech" phones is the ability of drug dealers to discard the phone for a phone with a new number. The GPS data from DRISCOLL's black 2015 Acura reflects that it left 150 Harriet Street at approximately **11:56 AM** and traveled to another residence associated with the DTO.

56.     On **July 10, 2023**, at approximately **9:46 PM** (Ref# 3393), **Target Telephone 2**, used by DRISCOLL, made the following outgoing call to 607-731-0324, utilized by Rechelle BROOKS:

> Kervin Driscoll (KD): *Yeah.*
> Rechelle Brooks (RB): *You left this piece.*

KD: *I'm leaving now.*

RB: *You left this piece.*

KD: *Yeah, just put it in the drawer.*

RB: *Alright.*

[End of Call]

57.    At approximately **9:47 PM** (Ref# 3394), **Target Telephone 2**, used by DRISCOLL made an outgoing call to 607-731-0324, utilized by Rechelle BROOKS:

Rechelle Brooks (RB): *Hello.*

Kervin Driscoll (KD): *Yo, bring that out for me, please.*

RB: *The piece?*

KD: *Yeah.*

[End of Call]

58.    GPS data reflected that **Target Telephone 2** was in the area of Harriet Street at the time of these calls (specifically between **9:39 PM** and **9:54 PM**).

59.    Based on my training, experience and knowledge of this investigation, in this phone call, BROOKS called DRISCOLL to say he left a gun, commonly referred to in coded language by narcotics traffickers as a "piece" out at her apartment at 150 Harriet Street.  DRISCOLL then called BROOKS and instructed her to bring the gun to him when he stated "*Yo, bring that out for me, please*" and she confirmed he was asking about the gun in responding, "*The piece?*" I believe BROOKS retrieved the firearm from inside 150 Harriet Street, Apartment 12B and provided it to DRISCOLL as he requested.

31

**Jeffrey BROWNELL**

60.     Jeffrey BROWNELL is a 55 year-old white male with no felony drug convictions who resides in Corning, New York. DRISCOLL supplies BROWNELL with quantities of cocaine and methamphetamine for re-distribution.

Intercepted Phone Calls Involving Jeffrey BROWNELL

61.     On **June 16, 2023**, at approximately **12:48 PM** (Ref# 1714), **Target Telephone 1**, utilized by DRISCOLL, made the following outgoing call to 607-664-6821, utilized by BROWNELL:

>       Kervin Driscoll (KD): *You call me*?
>       Jeffrey Brownell (JB): *Yeah*.
>       KD: *What's up?*
>       JB: *Uhh….A guy's got 3 but he won't come there but he'll come here.*
>       KD: *What for the other?*
>       JB: *No, the soft.*
>       KD: *Alright.  I'm gonna call you when I leave this gym.*
>       JB: *Alright.*
>       [End of Call]

62.     Based on my training, experience and knowledge of this investigation, BROWNELL informed DRISCOLL that BROWNELL had a customer who wanted to purchase $300 worth of cocaine and who will travel to Corning, but not Elmira ("*A guy's got 3 but he won't come there but he'll come here.*").

32

BROWNELL also informed DRISCOLL that he wanted powder cocaine ("*No. The soft.*").  DRISCOLL then agreed to supply BROWNELL with cocaine by traveling to Corning to meet him.

63.     At approximately **3:32 PM** (Ref# 1720), **Target Telephone 1**, utilized by DRISCOLL, received an incoming call from 607-664-6821, utilized by BROWNELL:

> Jeffrey Brownell (JB): *Hey.*
>
> Kervin Driscoll (KD): *Yo.*
>
> JB: *I need one and a half.*
>
> KD: *Alright.*
>
> JB: *Can you do separate?*
>
> KD: *Alright.*
>
> JB: *Hey I do wanna ask you a favor cause I don't have no place to do it. Is there anyway you can do us a half like you showed me?*
>
> KD: *Said do what?*
>
> JB: *The half like you showed me?*
>
> KD: *What you mean?*
>
> JB: *Just do it up.*
>
> KD: *I'll just talk to you when you get here.*
>
> JB: *Alright, alright I'll just I'll be down.*
>
> [End of Call]

64.     Based on my training, experience and knowledge of this investigation, BROWNELL informed DRISCOLL how much cocaine he needed ("*I need one and a half.*") and further requested DRISCOLL to separate a portion of the cocaine ("*Can you do separate?*").  Based on my training and experience, I believe that BROWNELL

initially asked DRISCOLL for $300 of powder cocaine and then followed up the request in the subsequent call to inform DRISCOLL that he needed one eight-ball (approximately 3.5 grams of cocaine) and then a half of an eight-ball (approximately 1.75 grams) separated ("*I need one and a half….Can you do separate?*").  Based on my training and experience, and discussions with other law enforcement officers, $300 would be consistent with the price for this quantity of cocaine.

65.    At approximately **4:05 PM** (Ref# 1726), **Target Telephone 1**, utilized by DRISCOLL, received an incoming text from 607-664-6821, utilized by BROWNELL that read, "Be there in about 10."

66.    At about the time of the **4:05 PM** text and continuing until approximately **4:13 PM**, footage from the covert camera in the vicinity of 1021 Oak Street showed suspected drug customers arriving at 1021 Oak Street.   At approximately **4:27 PM**, after the last suspected customer left, covert camera footage showed the black Acura depart 1021 Oak Street and travel in the direction of Corning, New York. Although BROWELL informed DRISCOLL that he would be at the meet location in "in about 10 [minutes]," the GPS data from the mobile tracking device on DRISCOLL's black 2015 Acura reflected that it arrived and remained in the area of 77 Lamphear Court in Corning from **4:53 PM** to **5:01 PM**. This location is an apartment building where DRISCOLL meets BROWNELL and other customers/distributors.  Physical surveillance observed DRISCOLL travel to the vicinity of Lamphear Court, but did not travel onto Lamphear Court as surveillance officers did not want to risk detection by DRISCOLL. Based on my

training, experience, and knowledge of the investigation, although BROWNELL informed DRISCOLL that he was arriving at the meet location, DRISCOLL continued to conduct drug sales at Oak Street and arrived to the meet with BROWNELL approximately 40 minutes later.

67.    At approximately **5:18 PM** (Ref# 1732), **Target Telephone 1**, utilized by DRISCOLL, received an incoming call from 607-664-6821, utilized by BROWNELL:

> Jeffrey Brownell (JB): *Hey just got into Bath so, alright I'll talk to you later.*
> Kervin Driscoll (KD): *Alright.*
> [End of Call]

68.    Based on my training, experience, and knowledge of this investigation, I believe BROWNELL informed DRISCOLL that BROWNELL avoided any law enforcement contact and made it safely to Bath, New York after receiving the requested narcotics from DRISCOLL ("*Hey just got into Bath so, alright I'll talk to you later.*").

69.    About four hours later, at approximately **9:06 PM** (Ref# 1765), **Target Telephone 1**, utilized by DRISCOLL, placed an outgoing call to 607-664-6821, utilized by BROWNELL. Immediately prior to this call, law enforcement monitoring **Target Telephone 1** observed several incoming calls from BROWNELL to **Target Telephone 1** that went unanswered.

> Jeffrey Brownell (JB): *Hello.*
> Kervin Driscoll (KD): *Yo, you call me?*

JB: *Yeah a bunch of times.*

KD: *I was at…[Call cuts out].*

JB: *What's that?*

KD: *I was at my daughter's graduation.*

JB: *Oh alright. Well I gotta come see ya.*

KD: *Alright come on.*

JB: *Alright.*

[End of Call]

70.     Based on my training and experience, I believe BROWNELL was telling DRISCOLL that BROWNELL wanted to meet DRISCOLL in order to be resupplied with an additional quantity of narcotics by him for other customers of BROWNELL's.

71.     At approximately **9:10 PM** (Ref# 1769), **Target Telephone 1**, utilized by DRISCOLL, received the following incoming call from 607-664-6821, utilized by BROWNELL:

Jeffrey Brownell (JB): *I know what I need.  I need four of the other…*

Kervin Driscoll (KD): *Alright.*

JB: *Uh...individually...*

KD: *Alright.*

JB: *And probably about 190 of the …regular.*

KD: *Alright.*

JB: *Alright. Thank you.*

[End of Call]

72.     Based on my training, experience, and knowledge of this investigation, I believe that during the call at **9:10 PM,** BROWNELL was ordering four ounces

(approximately 112 grams) of methamphetamine packaged in one-ounce increments ("*I need four of the other…Uh…individually*") and approximately $190 dollars' worth of cocaine ("*about 190 of the…regular*"). Footage from the covert camera positioned in the vicinity of 1021 Oak Street reflected that between **9:40 PM** and **10:30 PM**, approximately five vehicles arrived at the residence and stayed for short periods of time before leaving.  Although, due to darkness, the identity of BROWNELL (and others) arriving at the residence after these intercepted communications could not be confirmed, I believe BROWNELL was one of the customers who arrived at the DTO's drug sale location of 1021 Oak Street to purchase narcotics as he requested.

73.    On **June 18, 2023**, at approximately **2:14 PM** (Ref# 1868), **Target Telephone 1**, utilized by DRISCOLL, received the following incoming call from 607-664-6821, utilized by BROWNELL.

> Jeffrey Brownell (JB): *It's gonna be two. Two of the other and 250.*
> Kervin Driscoll (KD): *Alright. Alright*.
> [End of Call]

74.    Based on my training, experience, and knowledge of this investigation, BROWNELL ordered approximately two ounces (56 grams) of methamphetamine ("*It's gonna be two. Two of the other…*") and $250 worth of cocaine ("*…and 250*").

## BROWNELL STOPPED AFTER PURCHASING 112 GRAMS (4 OUNCES) OF METHAMPHETAMINE AND EIGHT (8) GRAMS OF COCAINE FROM DRISCOLL

75.    On the evening of **June 20, 2023**, BROWNELL (utilizing 607-664-

6821) and DRISCOLL (utilizing **Target Telephone 1**), discussed BROWNELL purchasing four ounces (112 grams) of methamphetamine and seven (7) grams of cocaine. As the calls were being monitored, law enforcement engaged in physical surveillance, observing DRISCOLL and BROWNELL meet for the drug transaction. BROWNELL was surveilled leaving the meeting and stopped by law enforcement, who seized approximately four (4) ounces of methamphetamine and approximately eight (8) grams of cocaine from BROWNELL and one of the other passengers in the vehicle. After the traffic stop, law enforcement intercepted conversations between DRISCOLL and BROWNELL discussing the stop and seizure of the drugs from BROWNELL. The calls, surveillance, and traffic stop are set forth below.

Intercepted Calls Between DRISCOLL and BROWNELL before Traffic Stop

76.     On **June 20, 2023**, at approximately **6:00 PM** (Ref# 1971), **Target Telephone 1**, utilized by DRISCOLL, received the following incoming call from 607-664-6821, utilized by BROWNELL:

> Kervin Driscoll (KD): *What's good bro?*
>
> Jeffrey Brownell (JB): *Ehh yeah you know. I'm gonna need, need one but you're going have to bring it here 'cause I don't have a ride. It's one of the other and then a buck thirty for me.*
>
> KD: *Shit, man. Alright, we'll see if I get out there.*
>
> JB: *Alright.*
>
> [End of Call]

77.     At approximately **6:05 PM** (Ref# 1972), **Target Telephone 1**, utilized by DRISCOLL, received the following incoming call from 607-664-6821, utilized by

BROWNELL:

> Jeffrey Brownell (JB): *[Unintelligible]…in a while.*
>
> Kervin Driscoll (KD): *Alright.*
>
> JB: *I'll let you know what I need when I'm out.*
>
> KD: *Alright.*
>
> JB: *Alright. Bye.*
>
> [End of Call]

78.     At approximately **8:21 PM** (Ref# 1977), **Target Telephone 1**, received the following incoming call from 607-664-6821, utilized by BROWNELL, which ended before any response from DRISCOLL was recorded:

> Jeffrey Brownell (JB): *Hey.  I need four of the other, three in one, one in the separate, and then three for me, three hundred.*
>
> [End of Call]

79.     At approximately **8:40 PM** (Ref# 1980), **Target Telephone 1**, utilized by DRISCOLL, received the following incoming call from 607-664-68231, utilized by BROWNELL:

> Jeffrey Brownell (JB): *Where you at man?*
>
> Kervin Driscoll (KD): *You there?*
>
> JB: *I'm here, yeah.*
>
> KD: *Alright. I'm coming around the corner.*
>
> [End of Call]

Surveillance of Drug Transaction and Traffic Stop of BROWNELL

80.    On **June 20, 2023**, at approximately **8:40 PM**, law enforcement surveillance observed a black 2015 Chevrolet Equinox bearing New York license plate GTP-3949 in the driveway at 1021 Oak Street and BROWNELL standing outside the vehicle.  At approximately **8:50 PM**, surveillance observed DRISCOLL leave his residence at 320 Orchard Street in the black Acura and arrive at 150 Harriet Street at approximately **8:52 PM**.  At approximately **8:57 PM**, surveillance observed DRISCOLL leave 150 Harriet Street in the black Acura and drive to 1021 Oak Street, where he pulled into the driveway at approximately **9:00 PM**. As DRISCOLL pulled into the driveway, BROWNELL approached the black Acura and conversed with DRISCOLL while he was in the black Acura.  Shortly thereafter, BROWNELL walked back to the Chevrolet Equinox and entered the rear passenger seat. At approximately **9:10 PM**, the Chevrolet Equinox departed 1021 Oak Street while law enforcement maintained surveillance of the Chevrolet Equinox.

81.    On the same date, at approximately **9:30 PM**, Trooper Ahearn conducted a traffic stop of the Chevrolet Equinox at mile marker 172, just east of exit 46, on I-86 west. BROWNELL was observed not wearing his seat belt and Trooper Ahearn requested that he step out of the vehicle, which BROWNELL agreed to do. Trooper Ahearn observed a large bulge coming from BROWNELL's gym shorts and asked    BROWNELL    what    was    in    his    pocket.    BROWNELL    "it's methamphetamine."  Trooper Mark Ahearn took possession of a bag containing approximately one (1) ounce (28 grams) of methamphetamine, which was wrapped

in a clear plastic bag. Trooper Ahearn also found a bag containing approximately eight (8) grams of cocaine in a pocket of BROWNELL's shorts. The front seat passenger Jason Ross was then asked to step out of the vehicle by Trooper Ahearn and, as Ross exited the vehicle, a plastic bag containing approximately three (3) ounces (84 grams) of methamphetamine fell out of Jason Ross' shorts and onto the ground. Troopers advised BROWNELL and Ross that they would be released and charged at a later date.

<u>Intercepted Calls After Traffic Stop of BROWNELL</u>

82.    On the same date, at approximately **11:15 PM** (Ref# 1983), **Target Telephone 1**, utilized by DRISCOLL received the following incoming call from 607-664-68231, utilized by BROWNELL:

> Jeffrey Brownell (JB): *..at the Troopers Barracks.  We all got jammed.*
>
> Kervin Driscoll (KD): *Fuck. Really?*
>
> JB: *Yes. Fucking shit.*
>
> KD: *With that shit!*
>
> JB: *Yep.*
>
> KD: *Where you all got pulled over at?*
>
> JB: *Yeah, I know.. that fucking… Where was it? Just outside of Corning. Said that they fucking gotta a call for an erratic driver. Fucking wasn't driving erratic. There was 3 of them that fucking pulled us over.*
>
> KD: *They got a call?*
>
> JB: *Yea, that's what they said. I told..I told the one cop can you be honest with me? I've been honest with you. Told you what I had. I said, "Be honest with me.  Did you really get a call for…" and he said, "Yeah." He said, "I got no reason to lie to you." Ughhh.  But…don't worry.  It's all good.*
>
> KD: *So what they said? They just let you all go?*

JB: *Well yeah, they didn't have a test kit so they didn't have a way.. they gotta send it away to test it and then they'll get the results back in about 2 weeks they said and they'll call us to them come in and got our fucking tickets. All they ticket us for was no seat belt.*

KD: *So who had the shit on them?*

JB: *I had 1 and the other guy had 3. I had mine.*

KD: *They found all that shit on you?*

JB: *Yep.*

KD: *Why they search y'all though?*

JB: *I don't know. He pat me down and…and he fucking felt it in my pocket, said what's that? So…*

KD: *But what made them take you out of the car and search you?*

JB: *I didn't have a seat belt on. That's what I don't understand.*

KD: *That don't mean you can search me.*

JB: *Yeah.*

KD: *Because you don't got a seatbelt, that's not probable cause to search you.*

JB: *Yeah.*

KD: *His license was good, right?*

JB: *Yup.*

KD: *Yeah, so he wasn't suppose to search ya'll. Why was ya'll, did he ask you to search?*

JB: *He just said, "I'm gonna pat you down" and I said, "Alright." For weapons and shit.*

KD: *But did he ask ya'll was it ok to search ya'll? Why'd he take you out the car is what I'm saying?*

JB: *Alright. Well he said it was because I didn't have my seatbelt on.*

KD: *So where the other dudes at?*

JB: *Jason's right here with me and his son got, he just got a couple tickets for his license plate and probably erratic driving.*

KD: *So where ya'll at? In Bath?*

JB: *No. We're outside the Trooper barracks waiting for my ride.*

KD: *Ya'll still at the Trooper's place?*

JB: *Yeah, outside.*

KD: *Oh shit man.  So where's the Trooper's barracks at in Corning?*

JB: *Coopers Plains.*

KD: *Oh.*

JB: *Fuckin sucks.*

KD: *Damn bro.*

JB: *I just had the other guy call me about his shit. I said, "Yeah, well, [unintelligible]"*

KD: *Damn.*

JB: *But I'll let you know in a couple weeks what happens then. But they said they'll be calling us in a couple weeks to come back in and you know write 'em up.*

KD: *Alright.*

JB: *I don't get that. Seems like fuckin the guy that arrested us now seems like he's not gonna, but he's gonna do a warrant if you do… But I'll let ya go. I just wanted to let you know.*

KD: *Did they…but they wasn't following ya'll from over this way, were they?*

JB: *No, no. They just all of the sudden came out of nowhere.  About three right in a row.*

KD: *Alright.*

JB: *Alright, man. I'll talk to you later.*

[End of Call]

83.     On the same date, at approximately **11:20 PM** (Ref# 1984), **Target Telephone 1**, utilized by DRISCOLL made the following outgoing call to 607-664-68231, utilized by BROWNELL:

Kervin Driscoll (KD): *He ain't ask you where you got none of that shit or none of that?*

43

Jeffrey Brownell (JB): *Nope. When I was talking to them on the side of the road, I said to him, he goes, "Ahh did you just get this or have you had it?" I said, "I just got it" and said "but that's as far as I'm going with it. I ain't gonna tell you where I got it." He goes, "I understand that." He says, "And that's your right" and I said, "Well I don't wanna end up dead." Ahh fuck.*

KD: *But did they ask you where you got it?*

JB: *No. He, well, he just ask me, "Did you just get this or.." I said, "Yeah." I said, "I got it in Elmira." No street no nothin. Ahh my God, my fuckin back.*

KD: *Alright bro.*

JB: *I'll be takin' a break. Trust me.*

KD: *Alright.*

JB: *Alright later.*

[End of Call]

84.    On **June 21, 2023**, at approximately **12:30 AM** (Ref# 1986), **Target Telephone 1**, utilized by DRISCOLL made the following outgoing call to 607-664-6821, utilized by BROWNELL:

Kervin Driscoll (KD): *Hey, yo.*

Jeffrey Brownell (JB): *Hey.*

KD: *Did you get your ride?*

JB: *Yup. Yeah, I'm back home.*

KD: *Yo, um, what happened with the kid that was driving?*

JB: *He didn't get nothing. He didn't have nothing on him.*

KD: *Oh, oh, so they charged you all separately?*

JB: *He got two tickets.*

KD: *So they charged you all separately?*

JB: *He got two tickets. Yeah, Alex he was lucky because the three were his, not his dad's, and his dad took the rap for him.*

KD: *Oh, word?*

44

JB: *Yeah.*

KD: *So why the fuck ya'll told them you came from Elmira?*

JB: *That's the way we were coming from, that where the complaint came from, Horseheads.*

KD: *Somebody in Horse…but where, but how was he driving? Was he driving crazy or speeding?*

JB: *No, no. We were getting on the off ramp there in Horseheads, and, freakin, you know how the one lane ends?*

KD: *Yeah.*

JB: *He had to speed up and the other car was kinda right there but, I don't know man. I don't, I don't think that was it. I don't know what the fuck's going on.*

KD: *Yeah, that's weird bro.*

JB: *Yeah, I know it, and nobody knew I was coming except for them two, so…but his dad has never been in any trouble either so…*

KD: *Yeah, I don't think they did that. I don't know, but if it was out here, they would have stopped ya'll right there leaving the house or something, you know what I'm saying?*

JB: *Right. Yeah, I wasn't, I had nothing to do.*

KD: *They wouldn't have let you get all that far.*

JB: *Yeah, I know it.*

KD: *Damn bro, just be safe bro.*

JB: *I know. It sucks.*

KD: *Damn.*

JB: *Alright.*

KD: *Alright, man.*

JB: *I'll talk to you later.*

[End of Call]

85.    Based on my training, experience and knowledge of this investigation,

BROWNELL ordered four (4) ounces (112 grams) of methamphetamine and eight

(8) grams of cocaine from DRISCOLL. Three (3) of the ounces of methamphetamine were going to a customer of BROWNELL's, and one (1) ounce of methamphetamine and eight (8) grams of cocaine was for BROWNELL. DRISCOLL left his residence, stopped at his BROOKS' residence, and traveled to the DTO's drug spot at 1021 Oak Street. There, DRISCOLL sold BROWNELL the requested methamphetamine and cocaine and BROWNELL departed for Corning. During the traffic stop, the police seized approximately three (3) ounces of methamphetamine from Jason Ross and approximately one (1) ounce of methamphetamine and approximately eight (8) grams of cocaine from BROWNELL. During the intercepted communications described above, DRISCOLL stated *"Did they…but they wasn't following ya'll from over this way, were they?"*, indicating that DRISCOLL was concerned that law enforcement may have determined that DRISCOLL was the source of supply for the seized narcotics during the traffic stop. Additionally, DRISCOLL repeatedly asked BROWNELL what the police asked him and what he told the police ("*He ain't ask you where you got none of that shit or none of that?... But did they ask you where you got it?*"). BROWNELL attempted to reassure DRISCOLL that he gave them no information that could tie DRISCOLL to the drugs ("*I said, "I got it in Elmira." No street no nothin…I said, "I just got it" and said "but that's as far as I'm going with it."*"). BROWNELL also conveyed to DRISCOLL that BROWNELL was aware of the consequences of talking to the police about DRISCOLL (*"I ain't gonna tell you where I got it"* and *"I don't wanna end up dead."*). BROWNELL also indicated he would not be making any more purchases of narcotics from DRISCOLL for a period of time as a result of being

stopped by the police following this purchase ("*I'll be takin' a break trust me.*").

86.    On **July 23, 2023**, at approximately **11:08 AM** (Ref# 3532) **Target Telephone 1**, utilized by DRISCOLL made the following outgoing call to 607-664-6821, utilized by BROWNELL:

Jeffrey Brownell (JB): *Hello.*

Kervin Driscoll (KD): *Yo, you still in the hospital?*

JB: *Yes I am.  [To third party: Thanks for stopping.]  Uhh yeah, a buddy of mine just was leaving.*

KD: *How you doing?*

JB: *Not very good.  I still can't get up you know by myself and stand up and walk.*

KD: *Oh ok.*

JB: *I'm still fucked up. They had a, I had a compressed disc in my neck and they had to take that out and put a metal one in so...*

KD: *Oh shit.*

JB: *It was pretty serious.  I didn't realize how serious it was but I'm afraid if I'm even gonna walk again or not...pretty fucked up...scared.*

KD: *Yeah man, just pray about it man.*

JB: *Yup I do and it's funny the guy that was just here and left yesterday, he had the exact same day, month, and birth year of my mother...it was like how does it you know, that's just...it's freaky.*

KD: *Yeah.*

JB:  *It's like she was here with me, you know?*

KD: *Yeah, that's crazy.*

JB: *Yup but...*

KD: *I was just checking on you to make sure you was alright.*

JB: *Well I appreciate that and I still haven't heard nothin' about that you know, I tried to get ahold of the other guy that was with me, but I can't seem to get ahold of him but I talked to his son that was driving that night and he said he hasn't heard nothing from him either. So I don't know what's going on I'm still.... you know I checked my messages because they said if I don't go back down to the barracks when they called that there's gonna be warrants or even indictments out and I just don't believe it.  I think, I think they fucked up and they know it, and they're not gonna get anything out of it or something I don't...*

KD: *Yeah.*

JB: *Or, ya know I still wonder about fuckin Kayla.....I don't, I just don't trust her.*

KD: *Yeah.*

JB: *I heard she's the one out there telling people that I'm 100% rat and shit.  I said I'm the last fuckin person that would tell anybody anything.*

KD: *Yeah I feel you.*

JB: *I said I told the Troopers that as soon as I started, put me in a car, "I said I'll tell you one thing," I said "I'm not telling you where I got it."  "Oh, I appreciate your honesty and your being up front about it" and I said, "well that's the way I am." I said "I told you what I had and you know when you asked me what was in my pocket" and I told 'em, I said "I was honest with you about everything I'm gonna be honest with you about this. Don't bother asking me." (JB laughing)*

KD: *Yeah.*

JB: *But yeah, I'm fuckin going nuts in here I know that.*

KD: *I bet man, I was just checking on you, you ain't heard from Sue?*

JB: *Nope, well she kicked me out I don't plan on talking to her.*

KD: *Oh she did?*

JB: *She kicked me out when I couldn't even (unintelligible) walk.*

KD: *Wow.*

JB: *Fuckin you know Kevin Quackenbush?*

KD: *Hold on one second, hold on.*

[End of Call]

87.     Based on my training, experience, and knowledge of this investigation, DRISCOLL contacted BROWNELL in order to get an update on BROWNELL's potential criminal charges following his arrest by the New York State Police on June 20, 2023, as DRISCOLL was concerned about his own involvement in any potential criminal proceedings ("*I was just checking on you to make sure you was alright.*"). BROWNELL responded that he had not heard anything and was skeptical if any charges would be coming ("*So I don't know what's going on I'm still…. you know I checked my messages because they said if I don't go back down to the barracks when they called that there's gonna be warrants or even indictments out and I just don't believe it. I think, I think they fucked up and they know it, and they're not gonna get anything out of it or something I don't...*"). BROWNELL then attempts to reassure DRISCOLL about not implicating DRISCOLL in any way when BROWNELL spoke to the police by reiterating that he did not tell the police who gave supplied him the methamphetamine and cocaine seized by the police ("*I'm not telling you where I got it.*").

## SURVEILLANCE OF DRISCOLL AND JACKSON AT THE DRUG HOUSE AT 1021 OAK STREET

88.     From May 8, 2023 to July 25, 2023, Elmira Police Department and New York State Police conducted physical surveillance and utilized a covert camera at 1021 Oak Street. In addition to the surveillance at 1021 Oak Street detailed above, DRISCOLL and JACKSON were observed daily having short duration visits from numerous people. During these visits, the people would enter 1021 Oak Street and leave within a few minutes. During the course of the investigation, DRISCOLL was

49

observed at 1021 Oak Street a minimum of four days per week on multiple occasions each day, and JACKSON was observed a minimum of three days per week (including the controlled buy of cocaine from JACKSON on July 25 (the day before the take-down), described in Paragraph 24 above.

### SURVEILLANCE OF DRISCOLL AT BROOKS' RESIDENCE AT 150 HARRIET STREET

89.     From May 8, 2023 to July 25, 2023, Elmira Police Department and New York State Police conducted physical surveillance of 150 Harriet Street.  During this time, law enforcement physically observed DRISCOLL outside of 150 Harriet Street or DRISCOLL's black Acura parked in the driveway or in front of the residence a minimum of three days per week, often on multiple occasions each day. Additionally, GPS Ping data reflected that **Target Telephone 1** and **Target Telephone 2** were in the vicinity of 150 Harriet Street multiple times weekly. It should also be noted that when DRISCOLL's black Acura was present at 150 Harriet Street, GPS Ping data on **Target Telephone 1** and **Target Telephone 2** also reflected that they were in the area at the same time, indicating that DRISCOLL was inside the residence with **Target Telephone 1** and **Target Telephone 2**.

### EXECUTION OF SEARCH WARRANTS ON JULY 26, 2023

90.     On **July 26, 2023**, the investigative team executed the search warrants issued by Judge Campanella in connection with this investigation.

#### 150 Harriet Street, Apartment 12B

91.     At approximately **5:00 AM**, law enforcement executed the warrant at

150 Harriet Street, Apartment 12B. Inside, law enforcement encountered BROOKS who was in the master bedroom and the sole occupant of the apartment. During the execution of a search warrant, agents seized the following:

- One (1) Phoenix Arms/HP25A, ACP .25 caliber semi-automatic handgun bearing serial number 4409155,[9] loaded with ten (10) rounds of .45 caliber ammunition, in a dresser drawer of the master bedroom;

- A plastic bag containing approximately one (1) kilogram of cocaine on the floor next to the dresser in the master bedroom;

- Three (3) cell phones in the master bedroom;

- One (1) digital scale on the kitchen counter; and

- One (1) cell phone on the kitchen counter.

1021 Oak Street

92.     At approximately **5:00 AM**, law enforcement executed the search warrant at the drug house at 1021 Oak Street. During the search of the location, which was unoccupied upon law enforcement entry, agents seized the following items:

- A plastic bag containing approximately five (5) grams of cocaine on a couch in the living room;

- One (1) digital scale on a coffee table in the living room;

- Numerous rounds of live .22 caliber, .380 caliber and 9mm caliber ammunition in a drawer of the TV entertainment stand in the living room;

- One (1) digital scale in a drawer of the TV entertainment stand in the living room;

- One (1) Kel-Tec P-11, 9mm semi-automatic handgun bearing serial

---

[9] A records check of this serial number indicated that this firearm was reported lost on April 15, 2014 in Towanda, Pennyslvania.

number AA0331,[10] loaded with 10 rounds of live ammunition, on a couch in the living room;

• A plastic bag containing approximately 184 grams of methamphetamine on a couch in the first floor living room;

• One (1) Taser on a couch in the first floor living room;

• One (1) round of live 9mm ammunition under the couch in the living room;

• A plastic Armor All container containing approximately 184 grams of methamphetamine inside the first floor bathroom wall;

• two (2) plastic baggies containing a total of approximately 40 grams of cocaine and two (2) plastic baggies containing a total of approximately 28 grams of xylazine[11] inside the first floor bathroom wall;

• A clear plastic bag containing numerous rounds of live .22 caliber and .32 caliber ammunition above a drop ceiling tile in the dining room ceiling;

• A plastic bag containing two (2) plastic bags containing a total of approximately 95 grams of cocaine on top of the kitchen cabinets;

• A clear plastic bag containing approximately four (4) grams of crack cocaine in a Great Value mini graham box inside the kitchen cabinets;

• One (1) digital scale with residue on a table in the dining room;

• One (1) digital scale in a coffee grinder box in the dining room;

• A knotted sock containing numerous rounds of live 9mm ammunition inside a kitchen cabinet; and

• A Night Owl DVR in the entertainment center in the living room that was connected to three (3) security cameras and actively recording and displayed on a television in the living room.

---

[10] A records check of this serial number indicated that this firearm was reported stolen on April 16, 2014 in Harrisburg, Pennsylvania.

[11] Xylazine is an animal tranquilizer that it is frequently mixed by narcotics traffickers with heroin and fentanyl to form a frequently lethal drug. Although xylazine is not currently listed as a controlled substance, I am aware that Congress has recently sought to add xylazine to the list of Schedule III controlled substances in a bill known as the Combating Illicit Xylazine Act.

320 Orchard Street

93.     At approximately **5:00 AM**, law enforcement executed the search warrant at 320 Orchard Street. Law enforcement encountered Kervin DRISCOLL and Austinishia Driscoll after calling them out of the residence.  During the search of the residence, agents seized the following items:

- A lanyard key chain in the small TV room with a key fob and several house keys. The key fob operated DRISCOLL's black 2015 Acura TLX bearing New York license plate JDL-5335; a gold-colored key unlocked the door lock at 1021 Oak Street; a silver-colored key unlocked the deadbolt of 1021 Oak Street; a third key unlocked the deadbolt from 150 Harriet Street, Apartment 12B;[12]

- $3,105.00 in U.S. currency which Kervin DRISCOLL handed to Austinishia DRISCOLL as police were separating them. Based on my training and experience, was an an attempt to avoid the seizure of the currency;

- Money counting machine in the small TV room;

- Six (6) cell phones in the master bedroom, including **Target Telephone 1** and **Target Telephone 2**; and

- Two (2) digital scales in the small TV room.

## CONCLUSION

94.     Based on the above information, there is probable cause to believe that Kervin DRISCOLL a/k/a "Mann", Terrance JACKSON a/k/a "Teej" a/k/a/ "TJ", Rechelle BROOKS and Jeffrey BROWNELL have violated Title 21, United

---

[12] After the execution of the search warrant at 150 Harriet Street, Apartment 12B, the deadbolt was removed by the maintenance staff.  EPD Investigator VanDine met with maintenance and retrieved the deadbolt lock that had been removed and found that the key marked "Hillman 67 WR5" opened the deadbolt lock removed from 150 Harriet Street, Apartment 12B.

States Code, Sections 846 (conspiracy to possess with intent to distribute and distribution of 500 grams or more of methamphetamine and 500 grams or more of cocaine, both Schedule II controlled substances, and a quantity of fentanyl and heroin, both Schedule I controlled substances). There is also probable cause to believe that DRISCOLL, JACKSON and BROOKS have also violated Title 18, United States Code, Section 924(c)(1)(A) (possession of a firearm in furtherance of a drug trafficking crime).

Christopher R. Mahaffy
Special Agent
Drug Enforcement Administration

Affidavit submitted electronically by email in .pdf format.
Oath administered, and contents and signature, attested to
me telephonically pursuant to Fed. R. Crim. P. 4.1 and 4 (d)
on August 29, 2023.

HON. MARK W. PEDERSEN
United States Magistrate Judge

54